IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

SHEM BAILEY,
   *Defendant*.

Criminal No.: ELH-16-396

### MEMORANDUM OPINION

Defendant Shem Bailey, who is now self-represented,[1] has filed a motion for compassionate release (ECF 113, the "Motion"), supported by exhibits. ECF 113-1. Bailey also asks the Court to appoint counsel for him. ECF 116.

In March 2017, Bailey entered a plea of guilty to the crimes of Hobbs Act Robbery and possession of a firearm in furtherance of a crime of violence. ECF 54. On October 16, 2017, the Court sentenced Bailey to a total term of 144 months of imprisonment. ECF 88. His sentence dates to July 28, 2016, when he was arrested. ECF 5.

The government opposes the Motion (ECF 121, the "Opposition"), supported by several exhibits. ECF 121-1 to ECF 121-5. Bailey replied. ECF 123 (the "Reply").

No hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, I shall deny defendant's request for the appointment of counsel. And, I shall deny the Motion, without prejudice.

---

[1] The Office of the Federal Public Defender advised the Court that it would not supplement Bailey's pro se filing. ECF 118.

## I. Background

Bailey and his codefendant were indicted on August 4, 2016.  ECF 19.  Bailey was charged with Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a) (Count One); using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Two); and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 5922(g)(1) (Count Three).  ECF 19.  Pursuant to a Plea Agreement (ECF 55), Bailey entered a plea of guilty on March 31, 2017, to Count One and Count Two of the Indictment.  ECF 54.  The parties agreed to a total sentence ranging from 120 to 180 months of imprisonment.  ECF 55, ¶ 10.

According to the Stipulated Statement of Facts in the Plea Agreement, on July 19, 2016, at approximately 3:57 p.m., the defendant and his codefendant, Herman Austin, robbed the Hamilton Quick Mart in Baltimore.  *Id*. at 10. Bailey entered the store, armed with a handgun, and demanded money from the cash registers.  The store employee gave the money to Bailey.  Austin  approached a customer playing Keno and attempted to take the customer's cellular phone.  When the customer resisted, Austin said: "I'm not trying to hurt you, my buddy has a gun."  Austin then took the customer's cellphone.  As Bailey walked towards the rear of the store, the employee jumped over the counter and fled.  Both Bailey and Austin then fled the store on foot.  *Id.*

Count One carries a maximum penalty of twenty years of imprisonment.  *Id.* ¶ 3.  By statute, Count Two carries a mandatory minimum term of imprisonment of seven years, consecutive to any sentence imposed as to Count One, with a maximum term of life imprisonment. *See* 18 U.S.C. § 924(c).  For Count One, the parties agreed to a base offense level of 20 under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines").  The parties also contemplated a three-level deduction for acceptance of responsibility, pursuant to U.S.S.G. 3E1.1.  As a result, Count One had a final offense level of 17.  *Id.* ¶ 6(b).

Sentencing was held on October 12, 2017.  ECF 87.  At the time of sentencing, Bailey was 38 years old.  *See* Presentence Report ("PSR"), ECF 70 at 2.  Bailey stood five feet, ten inches tall and weighed 190 pounds.  *Id*. ¶ 58.  The PSR noted that Bailey's father died of pancreatic cancer in 1995 and was not a part of defendant's upbringing.  *Id*. ¶ 52.  Bailey was raised by his maternal grandparents in New York.  *Id.* ¶¶ 53, 54.  He is the father of four children, who then ranged in age from five to twenty-one.  *Id.* ¶¶ 54-55.

Bailey also reported the following ailments: lupus, asthma, migraines, back pain, and chronic kidney disease.  *Id.* ¶59.  He is also a cancer survivor and had a kidney removed in 1991 because of his cancer.  *Id.* ¶60.

The PSR reflected that Bailey had nine prior adult criminal convictions, of which four scored points.  *Id*. ¶¶ 28-36.  In particular, in 1997, at the age of 18, Bailey was convicted of two robbery offenses in New York.  *Id*. ¶¶ 29, 30.  He was sentenced to three to six years of custody and was paroled in March 2004.  In September 2000, Bailey was convicted of possession of contraband and sentenced to two to four years of imprisonment.  *Id.* ¶ 31.  He also violated his parole for the two robberies.  *Id*.  Shortly after Bailey was paroled in March 2004, Bailey was arrested in New York for larceny, later was found guilty, and was sentenced to six months of incarceration.  *Id*. ¶ 32.  Bailey was paroled in February 2006.  *Id.* ¶¶ 29, 30.

In June 2006, Bailey was charged in Baltimore with second degree assault.  *Id.* ¶ 33.  He was later convicted and sentenced to a suspended term of eighteen months of imprisonment, with eighteen months of probation.  *Id.*  Bailey violated that probation by driving without a license in October 2006.  *Id.* ¶ 34.  As a result, he was sentenced to eighteen months of incarceration for violation of probation as to the 2006 second degree assault.  *Id.* ¶ 33.

On October 19, 2007, Bailey was arrested on the charge of possession of a firearm by a felon. *Id.* ¶ 35. He was indicted by a federal grand jury and found guilty of the offense in March 2008. ECF 70, ¶ 35. Judge Marvin Garbis sentenced Bailey to 111 months of imprisonment and five years of supervised release. But, the judgment was vacated on appeal and remanded for resentencing. In particular, the Fourth Circuit concluded that Bailey did not qualify as an armed career criminal. *Id.*; *see* MJG-07-0496, ECF 71.[2] Bailey was resentenced to time served from December 2007 to January 17, 2014. *Id.*, ECF 85.

Bailey subsequently violated supervised release,[3] and was sentenced to eight months of imprisonment. He was released on December 16, 2015, with his supervised release set to expire one year later. ECF 70, ¶ 35. Bailey committed the instant offenses while on supervised release. A Petition for a Violation of Supervised Release was filed. *Id.*

Bailey's criminal convictions yielded a subtotal criminal history score of 12. *Id.* ¶ 37. Two points were added because, at the time the instant offenses were committed, Bailey was on probation. *Id.* ¶ 38. Thus, as calculated by the PSR, Bailey had a total criminal history score of 14 points, yielding a criminal history category of VI. *Id.* ¶ 39.

With a final offense level of 17 and a criminal history category of VI, the Guidelines for Count One called for a period of incarceration ranging from 51 to 63 months. And, as noted, Count Two required a minimum term of 84 months, consecutive to Count Two. *Id.* ¶ 77. Thus, the total Guidelines range was 135 to 147 months of imprisonment. As noted, in the Plea Agreement the

---

[2] The case was initially assigned to Judge Richard Bennett, but was reassigned to Judge Garbis. Due to the retirement of Judge Garbis, the case was again assigned to Judge Bennett.

[3] Bailey was convicted of driving without a license on November 17, 2014. ECF 70, ¶ 36.

parties agreed to a sentence ranging between 120 and 180 months of imprisonment. *Id.* ¶ 78; ECF 55, ¶ 10.

On October 16, 2017, the Court sentenced the defendant to 60 months of incarceration for Count One and 84 months as to Count Two, consecutive, for a total term of 144 months of incarceration. ECF 88. The Court also imposed a term of three years of supervised release. *Id.*

In the Plea Agreement, Bailey waived many of his rights to appeal. ECF 55, ¶ 12. Nevertheless, Bailey noted an appeal to the Fourth Circuit. ECF 90. The government moved to dismiss the appeal (ECF 109), claiming it was barred by the Plea Agreement. The appeal was dismissed by the Fourth Circuit on March 27, 2020. ECF 110.

Bailey is currently incarcerated at FCI Butner II. ECF 125 at 1; ECF 121-1; *see also Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited August 23, 2022). The Bureau of Prisons ("BOP") indicates a projected release date of February 4, 2027. With credit for pretrial detention dating from July 28, 2016, Bailey has served about 72 months of his 144-month sentence, or approximately 50% of the sentence initially imposed.

On June 25, 2021, Bailey filed a motion for compassionate release, arguing that he is at risk of severe COVID-19 due to his physical health. ECF 113. The government concedes that Bailey's medical conditions confer threshold eligibility for compassionate release. But, it argues that defendant "no longer presents an 'extraordinary and compelling reason' because he has declined vaccination." ECF 121 at 19. According to defendant's medical records, Bailey refused the COVID-19 vaccine in March 2021. ECF 121-2 at 9. Additionally, the government notes that Bailey has already contracted COVID-19 and recovered from it, without significant consequence. ECF 121 at 27. And, in any event, the government argues that the balance of the sentencing factors in 18 U.S.C. § 3553(a) supports a denial of relief. *Id.* at 29-32.

Bailey filed an administrative request for compassionate release, which was denied by the Warden of FCI Butner II on March 29, 2021.  ECF 113-1 at 11.  The government does not contest that Bailey has exhausted his administrative remedies.

Additional facts are included, *infra*.

## II. Appointment of Counsel

As mentioned, Bailey asks the Court to appoint counsel for him to assist in litigating the Motion.  ECF 116.  He asserts that he is indigent and "has limited knowledge of the law."  *Id.*  But, there is no constitutional right to appointed counsel in post-conviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").  Rather, the determination to appoint counsel in this context rests solely within the discretion of the district court.  *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Moreover, Bailey has ably demonstrated the ability to articulate the legal and factual basis of his claims.  And, a review of defendant's case does not reveal any unusual or exceptional circumstances that would warrant the appointment of counsel.

For the reasons set forth above, I shall deny defendant's request for counsel, without prejudice.

## III. The Motion

### A. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395

(4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022).  This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a

court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing

Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[4]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the

---

[4] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, ___ F. App'x ___, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily

summarized." *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c).  *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments.  *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release.  Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for

release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g., United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As noted, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the

sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

## B. COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5] COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

---

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*
*COVID deaths after losing political battles*, Reuters (May 12, 2022),
https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.
And, as of August 23, 2022, COVID-19 has infected more than 93 million Americans.  *See*
*COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed August
23, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v.*
*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).
Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the
pandemic.  *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described
as the worst public health crisis that the world has experienced since 1918.  *See United States v.*
*Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents
a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the
pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as
we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich.
May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt.  For quite some
time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart
the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19),*
*How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (Apr. 2, 2020),
https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

14

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In May 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[6]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first

responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.   Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from ages 5 to 11, 60% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 92% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES,   https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated August 18, 2022).

Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated July 20, 2022).  And, federal regulators approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022),   https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of August 23, 2022, the BOP had 141,526 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 327,923 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed August 23, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August

14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the

United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron*

*Variant:  What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13,

2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See,*

*e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN

(Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S.*

*coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7,

2022),                https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-

updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.    Again, the country began to return to

normalcy.

Unfortunately, that respite did not last long.  We soon experienced another surge in

COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should*

*We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-

are-rising-again-how-cautious-should-we-be.html.   In particular, a new subvariant of the virus

began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella

Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9,

2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.    As

of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," is "spreading

quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired

by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ."   Amelia Nirenberg, *A Coming Fall Surge?*,  N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

As of August 23, 2022, the BOP reported that 496 federal inmates, out of a total population of 141,526, and 647 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 49,325 inmates and 13,565 staff have recovered from the COVID-19 virus.  In addition, 306 inmates and seven staff members have died from the virus.  The BOP has completed 128,717 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Butner Medium II FCI, where the defendant is imprisoned, the BOP reported that as of August 23, 2022, out of a total of 1,467 inmates, 1 inmate and 1 staff member have currently tested positive, 4 inmates and zero staff members have died of COVID-19, and 341 inmates and 91 staff have recovered at the facility.  In addition, 978 staff members and 3,814 inmates have been inoculated with the vaccine at the Butner Complex. *See* https://www.bop.gov/coronavirus/;    BUREAU    OF    PRISONS, https://www.bop.gov/locations/institutions/btf/ (last visited August 23, 2022).

### C. Discussion

Bailey contends that he has an increased risk of severe illness from COVID-19 due to his underlying physical health conditions.  ECF 113.  Bailey's medical records indicate that he suffers from three conditions that the CDC identifies as risk factors for a more serious case of COVID-

19: asthma; a body mass index ("BMI") over 25; and chronic kidney disease.  *See* ECF 121-2; ECF 122-3; ECF 124.

With regard to asthma, the CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19."  *People with Moderate to Severe Asthma*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated Apr. 7, 2022).  However, it is unclear, based on the record, if Bailey's asthma qualifies as "moderate to severe."  Bailey is currently prescribed Albuterol to control his condition and reports using an inhaler a few times a week.  ECF 124 at 2.

Rulings as to asthma as an extraordinary and compelling reason are mixed.  Judge Grimm of this Court has noted: "This Court and others have found that the standard of extraordinary and compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions. . . . However, in some cases this Court and others have found that mild asthma alone did not a [sic] constitute extraordinary and compelling reasons for release."  *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release. . . . Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'"  *United States v.*

*Garcia*, 538 F. Supp. 3d 226, 229 (D. Mass. 2021) (internal citations omitted).  *See also, e.g.*, *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions; *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding it was not warranted based on medical records indicating asthma is under control defendant was instructed to use Albuterol only to prevent attack, but not daily).

There is no evidence that Bailey suffers from daily symptoms, uses an Albuterol inhaler on a daily basis, or experiences any other limitation of normal activities that would suggest his condition rises to the level of moderate or severe.  To the contrary, his asthma appears to be controlled.  Accordingly, Bailey's asthma would seem to fall into the more mild category, and would not support a finding of extraordinary and compassionate release.

Bailey's medical records show a BMI of 29.5, which qualifies him as overweight under the CDC guidelines.  ECF 121-3 at 26.  Some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19.");

*United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding defendant with a BMI of 32.5 was obese qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

On the other hand, a number of courts have declined to find grounds for compassionate release even when considering defendants with higher BMIs.  *See, e.g.*, *United States v. Waugh-Hixon*, PWG-19-137, 2021 WL 4750713, at *3 (D. Md. Oct. 21, 2021) (BMI of 30); *United States v. Lucero*, No. 16-CR-3040-DMS, 2021 WL 1297828, at *2 (S.D. Cal. Apr. 7, 2021) (BMI of 29); *United States v. Leondi*, Crim. No. 17-527 (SDW), 2021 WL 717361, at *2 (BMI of 29.6); *United States v. Moore*, Crim. No. 18-474, 2021 WL 308331, at *2 (E.D. Penn. Jan. 29, 2001) (finding that defendant's "slightly elevated BMI of 25 does not justify his release," and noting that "[c]ourts

have consistently denied compassionate release to inmates with significantly higher BMI levels.");

*United States v. Dunich-Kolb*, Crim. No. 14-150 (KM), 2020 WL 6537386, at *6 (BMI of 27.7).

As noted, Bailey had one of his kidneys removed as a child due to cancer and has been diagnosed with Stage III chronic kidney disease. ECF 124. The CDC is clear that "chronic kidney disease of any stage can make you more likely to get very sick from COVID-19." *People with Certain Medical Conditions*, *supra*. Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *Id.* And, this Court has previously found extraordinary and compelling circumstances for a defendant who had multiple medical conditions that included chronic kidney disease. *See United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity).

In its Opposition, the government notes that Bailey has already contracted COVID-19 and recovered from it without significant consequence. ECF 121 at 27. However, a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

On the other hand, Bailey's decision to refuse the COVID-19 vaccine weighs against him, and substantially weakens his argument for compassionate release. As the government notes (ECF

121 at 19), and as defendant's medical records reflect (ECF 121-2), Bailey declined an opportunity to receive the Pfizer COVID-19 vaccine.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). And, I have previously joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

As Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021);

*United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

In his Reply, Bailey notes a "Vaccine Exemption Status" that he has had since pediatric care on the advice and recommendation of his healthcare providers. ECF 123 at 10. He claims that, according to his healthcare providers, who are now retired and/or deceased, there was a "necessary precaution to immunization due to the severe allergic adverse reactions that Mr. Bailey suffered with other medications." *Id.* at 11. However, as the government notes, Bailey's medical records contain no known medical contraindication for the vaccine. ECF 121 at 19.

The vaccine is central to preventing dangerous mutations. *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants From Developing*, HENRY FORD HEALTH SYS. (Sept. 27, 2021), https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants. Moreover, "vaccines are the best way to protect yourself and others against COVID-19." Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH DIRECTOR'S BLOG (Dec. 14, 2021), https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/. In any event, I shall assume that defendant's combined, underlying health conditions constitute an extraordinary and compelling reason for a sentence reduction.

In his Reply, Bailey argues that his family circumstances also support a finding of compelling and extraordinary reasons to reduce his sentence. *Id.* Specifically, Bailey claims that his mother suffers from leukemia, diabetes, hypertension, onset long-term memory loss, carpel tunnel syndrome, and other ailments. *Id.* The medical records of defendant's mother were not submitted, but the defendant provided two letters with his Reply, one from his mother and one

from a neighbor who has assisted his mother.  ECF 123-1.  Defendant's mother attests that her husband of 34 years recently passed away and that "it would seem imperative to have her son here to help."  *Id.* at 1.  The neighbor's letter states that because of her new jobs, she is no longer able to extend a helping hand.  *Id.* at 2.

Relevant here, the commentary to U.S.S.G. § 1B1.13 provides that either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" may constitute a compelling reason for the defendant's release.  U.S.S.G. § 1B1.13 cmt.1(C).  But, in the absence of evidence that a prisoner is the sole available caregiver for his or her minor child or incapacitated spouse, district courts typically find that the inmate's family circumstances do not amount to an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A).  *See*, *e.g.*, *United States v. Johnson*, 13-00082 (KSH), 2021 WL 3260847, at *4 (D.N.J. Jul. 29, 2021); *United States v. Tucker*, 3:14-CR-0367-B-84, 2021 WL 977100, at *1 (N.D. Tex. Mar. 15, 2021); *United States v. Tyler*, Crim. No. 09-391, 2021 WL 736467, at *4 (E.D. La. Feb. 25, 2021); *United States v. Bolden*, CR-16-320-RSM, 2020 WL 4286820, at *5 (W.D. Wash. Jul. 27, 2020).

The record does not establish that Bailey is the only possible caregiver for his mother.  *See Hamilton*, 715 F.3d at 337 (establishing that defendant, as the moving party, bears the burden of establishing that he is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)); *Edwards*, 451 F. Supp. 3d at 565 (same).  Thus, in my view, defendant has failed to establish an extraordinary and compelling reason for his release on the basis of his family circumstances.

As noted, I shall assume, *arguendo*, that Bailey has demonstrated extraordinary and compelling medical or family circumstances for compassionate release.  The Court must then balance the applicable factors under 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186.

The coronavirus is not "tantamount to a 'get out of jail free' card."  *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

In my view, a balancing of the § 3553(a) factors indicates that defendant's release from prison is not warranted at this time.  As the government notes, Bailey's crime of conviction was a serious one: Bailey was convicted of an armed robbery offense, which involved threatening two individuals at gunpoint.  ECF 70, ¶¶ 8-9.  Such conduct was in complete disregard to the safety of others.  Although the robbery never resulted in physical injury to others, the threat from having a firearm was an inherent part of Bailey's crime.  Consequently, the seriousness of the instant offense weighs against reducing Bailey's sentence.

Additionally, the Court cannot overlook the defendant's criminal history, which reveals a pattern of recidivism and yielded a criminal history category of VI.  *Id.* ¶ 39.  Bailey had nine prior

31

adult criminal convictions. *Id*. ¶¶ 28-36. Some of these offenses were less serious than others, but some offenses were significant. As mentioned, Bailey was convicted twice of robberies involving commercial establishments in New York. *Id.* ¶¶ 29-30. While incarcerated for those robberies, Bailey was found guilty of possessing contraband. *Id*. ¶ 31. Upon release, Bailey was convicted of larceny in 2004 and of second degree assault in 2006. *Id.* ¶¶ 32-33.

Just a year after the assault, Bailey was convicted in federal court of possession of a firearm by a prohibited person. *Id*. ¶ 35. He received a lengthy sentence and experienced federal incarceration. Although the sentence was vacated on appeal, the conviction itself was not set aside. And, defendant still experienced a significant period of incarceration. Yet, that did not deter him from engaging in crime. Defendant committed the offenses at issue here while on supervised release, after a period of federal incarceration.

Bailey asserts that he is no longer "a danger nor a threat to the community." ECF 113 at 7. He also claims that he has furthered his rehabilitation efforts by obtaining a certificate in criminal law and avoiding disciplinary issues in prison. ECF 123 at 8. In addition, Bailey notes his desire to spend time with his grandchildren. ECF 125 at 2.

Bailey's rehabilitative work while incarcerated is laudable, and his desire to spend time with his grandchildren is eminently understandable. The Court applauds Bailey for his positive efforts to return to society. But, "rehabilitation alone cannot serve as a basis for compassionate release." *Davis*, 2022 WL 127900, at *1. This is not the "grievous case[]" warranting compassionate relief. *McCoy*, 981 F.3d at 287.

Moreover, the Court remains troubled by the severity of Bailey's offenses of conviction, coupled with his criminal history and his repeated failure to conform his conduct to societal

expectations.  Consequently, I am persuaded that the § 3553(a) factors militate against Bailey's immediate release.

Bailey's Motion also contains what appears to be a request for home confinement.  ECF 113.  But, any request for the conversion of a sentence of imprisonment to a sentence of home confinement must be submitted to the BOP, and not to this Court.  Section 3624(c) of Title 18 of the United States Code is the only statute that authorizes the transfer of an inmate from prison to home confinement.  That section specifically provides that "[t]he authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months." 18 U.S.C. § 3624(c)(2).  However, this authority resides with the BOP, and not with the courts.

Moreover, although § 12003(b)(2) of the CARES Act states that, during the COVID-19 emergency, "the director of the Bureau [of Prisons] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement," this provision does not alter the exclusive authority of the BOP to make this determination. *See United States v. Baker*, No. l:10-cr-69-MR-1, 2020 WL 2430945, at *1 (W.D.N.C. May 12, 2020) (stating that authority to grant such relief rests solely with the Director of the Bureau of Prisons); *United States v. Gray*, No. 4:12-CR-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (finding "defendant must seek home confinement through the BOP's administrative system"); *United States v. Johnson*, Crim. No. JKB-14-0356, 2020 WL 1929459, at *2 (Apr. 21, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)."). Therefore, this Court does not have the authority to place the defendant in home confinement.  This request must be made through the BOP's administrative system.

### IV. Conclusion

For the reasons stated above, I shall deny defendant's request for the appointment of counsel (ECF 116).  Further, I shall deny the Motion (ECF 113), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: September 1, 2022                    _____/s/_____

                                           Ellen L.  Hollander
                                           United States District Judge